## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| **BRIAN PILLOW #244136,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **NO. 1:21-CV-00066** |
| **v.** | ) | |
| | ) | **JUDGE CAMPBELL** |
| **WARDEN MARTIN FRINK,** | ) | **MAGISTRATE JUDGE HOLMES** |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Brian Pillow, an inmate of Trousdale Turner Correctional Center in Hartsville, Tennessee, filed a pro se, in forma pauperis petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction on three counts of selling 0.5 grams or more of cocaine in a drug-free zone for which Petitioner is serving a sentence of twelve years of imprisonment in the Tennessee Department of Correction. (Doc. No. 1).

Respondent filed an Answer to the petition in which he asks the Court to dismiss the petition with prejudice. (Doc. No. 13).

The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and Petitioner is not entitled to relief. *See Christian v. Hoffner*, No. 17-2105, 2018 WL 4489140, at *2 (6th Cir. May 8, 2018) ("A district court is not required to hold an evidentiary hearing if the record 'precludes habeas relief.'") (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007))). The petition therefore will be denied, and this action will be dismissed.

1

I.  PROCEDURAL HISTORY

The Maury County Grand Jury indicted Petitioner on three counts of selling 0.5 grams or more of cocaine in a drug-free zone. (Doc. No. 12-1 at PageID# 82-84). Petitioner proceeded to trial, where a jury convicted him as charged. *State v. Pillow*, No. M2014-01355-CCA-R3-CD, 2016 WL 1270263, at *1 (Tenn. Crim. App. Mar. 31, 2016), *perm. appeal denied*, (Tenn. Aug. 18, 2016). The trial court sentenced Petitioner to twelve years of imprisonment. *Id*.

On direct appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's convictions, *id.*, and the Tennessee Supreme Court denied Petitioner's application for discretionary review on August 18, 2016. (Doc. No. 12-13 at PageID# 723).

Petitioner then pursued post-conviction relief by timely filing a pro se petition on March 14, 2017. (Doc. No. 12-14 at PageID# 732-67). The post-conviction court appointed post-conviction counsel, who amended the petition. (*See id*. at Pag ID# 789). After conducting an evidentiary hearing, the post-conviction Court denied relief. (Doc. No. 12-14 at PageID# 792-800).

On appeal of denial of post-conviction relief, the Tennessee Court of Criminal Appeals affirmed. *Pillow v. State*, No. M2018-01275-CCA-R3-PC, 2020 WL 7040532, at *1 (Tenn. Crim. App. Dec. 1, 2020), *perm. appeal denied*, (Tenn. Mar. 17, 2021). On March 17, 2021, the Tennessee Supreme Court denied discretionary review. *Id*.

Petitioner filed the instant petition on October 21, 2021, by placing it in the prison mailing system. (Doc. No. 1 at PageID# 7). This is Petitioner's first federal collateral challenge to the constitutionality of his confinement under the at-issue judgment of conviction.

2

The Court directed Respondent to respond to the petition and specifically to Petitioner's tolling argument. (Doc. No. 7). Respondent has now responded (Doc. No. 13), and Petitioner filed a response to the response (Doc. No. 14).

## II. STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's trial as follows:

> At trial, Columbia Police Detective Jason Dark testified that in May 2012, Kevin Odie, a "street-level" drug dealer, was charged with narcotics offenses. Thereafter, Odie approached the District Attorney General and offered to work as a confidential informant in an attempt to obtain leniency on his charges. Odie spoke with Detective Dark about purchasing drugs from certain individuals, including the Appellant.
>
> Detective Dark said that Odie purchased crack cocaine from the Appellant on three occasions: May 2, 2012; May 4, 2012; and May 11, 2012. The procedures before and after each transaction were largely identical. Odie telephoned the Appellant, who agreed to sell the drugs and gave directions to a specific location. Immediately after each call, officers searched Odie and his vehicle to ensure he had no contraband. The officers photocopied the money to be used during the purchase then gave Odie the cash to purchase two grams of cocaine. On May 2, Odie was given $100; on May 4, he was given $130; and on May 11, he was given $150. Detective Dark did not know why the price continually increased.
>
> Detective Dark recalled that before each transaction, Odie was equipped with an audio/video recording device. The recording equipment was set up so that Detective Dark could hear the transaction as it occurred, but he could not view the video until he recovered the device from Odie and downloaded the recording to a computer.
>
> Detective Dark said that after being searched and given money, Odie drove to 501 Martin Drive as directed by the Appellant. The location was approximately 698 feet from Fairview Park. The May 2 purchase occurred in a shed on the property, the May 4 purchase occurred in the yard, and the May 11 purchase occurred inside a maroon sport utility vehicle (SUV) that was parked in the driveway. Detective Dark said that the SUV was registered to Tonya Perry, who had "associated with" the Appellant.
>
> Detective Dark said that after each purchase, Odie met with the police and gave them a substance that was packaged in a plastic sandwich baggie and appeared to be crack cocaine. The detective sent the substances to the Tennessee Bureau of

Investigation (TBI) crime laboratory for testing. He said that the amount of drugs Odie received was larger than the amount the police typically obtained for the amount of money provided.

On cross-examination, Detective Dark said that the price for one gram of crack cocaine was usually $100; however, Odie received more than two grams during each purchase. Odie was given $150 for the third transaction. After the transaction, Odie returned $10 and explained that he paid $140 for the drugs.

Detective Dark said that prior to each transaction, Odie's vehicle was searched in a well-lit garage. He could not recall whether he or another officer searched the vehicle but stated that ["][i]t's just protocol. It's something we do. He explained that the officers did not "strip search" an informant but that all of the informant's pockets were checked. He did not check inside Odie's socks or shoes because he trusted Odie.

Detective Dark stated that the Appellant was not arrested on the day of the last transaction; however, he was arrested in December 2012 after the grand jury returned an indictment against him. At the time of his arrest, the Appellant was in possession of $1,400 in cash. None of the bills matched the serial numbers of the cash used in the controlled purchases.

Detective Dark said that while working as a confidential informant, Odie made over 100 controlled buys from approximately forty individuals.

Kevin Odie testified that he had three prior felony convictions, two for selling crack cocaine and one for selling marijuana. He also had two pending charges of selling crack cocaine in a school zone and one pending charge of selling marijuana. He volunteered to buy crack cocaine for the police, hoping that his assistance would keep him from being incarcerated.

Odie testified that his nickname was "Kap." He had known the Appellant, whose nickname was "Bear," for approximately one year. Odie's first purchase of crack cocaine from the Appellant occurred on May 2, 2012. On that day, Odie called the Appellant, and they arranged to meet so that Odie could buy one gram of cocaine. The Appellant told Odie the crack cocaine would cost $100. Odie went to the meeting with a woman he "used to call [his] wife." Prior to leaving for the meeting, Odie, his companion, and the inside of the white Ford Explorer Odie was driving were searched by the police. The officers found no money or drugs. The police equipped Odie with recording equipment and provided him with money prior to the transaction. The video recording, which was played for the jury, captured the entire transaction. As the recording was played, Odie explained what was depicted. The video showed Odie driving to the meeting. During the drive, he called the Appellant, who told him to come to a location near Fairview Park. Prior to his arrival, Odie called the Appellant to let him know he was on his way. During the conversation, the Appellant gave directions to his exact location. As

they talked, Odie told the Appellant, "'I got a bill,'" which meant $100. The Appellant responded, "'I gotcha,'" and indicated that Odie should "come on." Odie identified his and the Appellant's voices on the recording.

Odie said that after approximately ten or fifteen minutes, he arrived at the designated location. He saw a white house with an unattached brown shed, which he identified on the recording. As he walked toward the shed, the Appellant opened the door. Odie identified the Appellant as the person seen on the recording. Odie stepped inside the shed and saw another man with the Appellant. The Appellant said that he did not know whether Odie "wanted it soft or hard," meaning powder or crack cocaine, respectively. Odie indicated he wanted crack cocaine. Odie explained that the video showed the Appellant getting the drugs out of a "dope sack." The Appellant weighed the crack cocaine then told Odie, "'I gave you 2.5 [grams],'" which was more than Odie had requested. Odie said that he would "definitely holler back at him again" for more crack cocaine. After the Appellant gave Odie the crack cocaine, Odie put $100 on the table; however, he never saw the Appellant pick up the money. Afterward, Odie returned to the Explorer, called Detective Dark, and advised him that he was on his way to meet with the officers. Odie did not stop anywhere along the way. As soon as he arrived at the designated location, Odie relinquished the crack cocaine to the officers and described the transaction.

Odie said that on May 4, 2012, he again met with the officers prior to meeting with the Appellant.[1] The police searched Odie, his vehicle, and his female companion and set up the recording equipment. The recording of the transaction was played for the jury, during which Odie again explained what was happening and identified the Appellant. Odie said that he thought he was supposed to try to buy a larger amount of crack cocaine. Once in Columbia, Odie called the Appellant, but the Appellant was at a barbershop and promised to call Odie when he left the shop. The Appellant called a short while later and told Odie to return to the location of their previous meeting. When Odie arrived, the Appellant walked toward Odie and handed him a cigarette pack containing crack cocaine. Odie gave the Appellant $130. Odie told the Appellant that he would likely "holler at" him again. When the transaction was complete, Odie called Detective Dark and arranged to meet the officers. Upon arrival, Odie relinquished the drugs and provided details of the encounter.

Odie said that the final purchase took place on May 11, 2012, at the same location near Fairview Park. Once again, the police gave Odie recording equipment and searched Odie and his vehicle before he left. The recording of the transaction was played for the jury, and Odie narrated what transpired on the video. When Odie arrived at the location, the Appellant was sitting in the driver's seat of a maroon SUV, and a man named Huey was sitting in the front passenger seat. Odie got into the backseat of the vehicle. The Appellant handed Odie the crack cocaine without

---

[1] On cross-examination, Odie stated that he met with the police before and after the transactions at a "garage out there off Main Sail or Impact Drive."

5

turning around and indicated that he was giving Odie three grams of crack cocaine. Odie told the Appellant he had $150, but the Appellant said the price was only $140. Odie kept $10 and gave the Appellant $140. Afterward, Odie met with the officers, returned the $10, and relinquished the crack cocaine.

Odie said that during each transaction, he dealt exclusively with the Appellant. The location of the transactions and the price of the drugs were determined by the Appellant.

The State then asked the trial court to have the Appellant "step forward before the jury and display his bare arms to the jury." Following the trial court's instructions, the Appellant removed his long-sleeved shirt, rolled up the sleeves of his t-shirt, and showed his arms, which were tattooed, to the jury.

On cross-examination, Odie said that the State had not promised him anything for his assistance but that he hoped his cooperation would work in his favor on his pending charges. He acknowledged that he made thirty or forty controlled drug buys for the police and that the purchases were made from several individuals.

On redirect, Odie acknowledged that he was in "big trouble" as a result of his pending charges and that he had volunteered to help the State, hoping he could avoid returning to prison. He stated, however, that the State never asked him to purchase drugs specifically from the Appellant. Odie said that he did not see the Appellant pick up the money during the first transaction; however, he left the money on the table for the Appellant in exchange for the crack cocaine.

After Odie testified, the parties stipulated that Fairview Park was a drug free zone pursuant to Tennessee Code Annotated section 39-17-432(b)(1).

Brett Trotter, a forensic scientist with the TBI, testified that he received three separate packages from the Columbia Police Department. Each package contained a plastic sandwich bag containing crack cocaine. The first bag contained 2.39 grams, the second bag contained 2.56 grams, and the third bag contained 2.90 grams.

The jury found the Appellant guilty of three counts of selling .5 grams or more of cocaine in a drug-free zone. The trial court imposed concurrent sentences of twelve years for each offense. On appeal, the Appellant contends that the trial court erred by requiring the Appellant to expose the tattoos on his arms to the jury and by admitting still photographs of his tattoos into evidence. Additionally, the Appellant challenges the sufficiency of the evidence sustaining his convictions.

*State v. Pillow*, No. M2014-01355-CCA-R3-CD, 2016 WL 1270263, at *1-3 (Tenn. Crim. App. Mar. 31, 2016).

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's

post-conviction hearing as follows:

> At the post-conviction hearing, Petitioner testified that he had three meetings with trial counsel prior to trial. They discussed a plea offer during one of those meetings. Petitioner agreed that the State made one plea offer to him but he understood that trial counsel was seeking a better offer. Petitioner testified: "So I wouldn't took [sic] the offer because he's saying he could possibly get me a better plea agreement. He didn't say for sure that he was going to but he was going to let me know if he was or wasn't." Petitioner claimed that no one told him that the first plea offer was a final offer. He said that trial counsel came to the Turney Center and spoke with him three days prior to the trial date. Petitioner testified that trial counsel asked if he was ready for trial and noted that the State's plea offer was "off the table." He claimed that trial counsel never told him that there was a "timetable' [sic] for acceptance of the State'' offer or that the offer was a final one. Petitioner testified that he did not give the plea offer the same consideration that he would have given had he known that the offer was a final offer. Petitioner asserted that he realized the morning of trial that no plea offer would be accepted.
>
> Petitioner testified that he felt that Kevin Odie's testimony at trial was untruthful because he said that no promises or deals had been made with him prior to his testimony in Petitioner's case. Petitioner asserted that Mr. Odie failed to acknowledge at trial that his bond had been significantly reduced in exchange for agreeing to work for police, which Petitioner said that he found out by reading this Court's opinion in *State v. Travis Lindsey*, M2015-01954-CCA-R3-CD, 2016 WL 5937835 (Tenn. Crim. App. Oct. 12, 2016). As mentioned in that opinion, Officer Gray testified on cross-examination that Mr. Odie had pending charges for selling drugs and that Mr. Odie contacted police with information related to purchasing cocaine. As a result of his cooperation with police, Mr. Odie's bond was reduced on April 5, 1012, from $100,000 to $2,500. Officer Gray admitted that Mr. Odie's bond was reduced in order for him to help the police. He also agreed that "an informant who testified at trial generally received more consideration than one who remained confidential." *Id*. at *2.
>
> Petitioner asserted at the post-conviction hearing that the State should have corrected Mr. Odie's perjured testimony at his trial. He further asserted that the State knew that "deals" had been made with Mr. Odie, and Petitioner's trial counsel should have known. Petitioner believed that Mr. Odie's dishonesty on the witness stand about the bond reduction was one of Petitioner's "greatest arguments" on post-conviction and would have affected the outcome of his case. Petitioner was aware that Mr. Odie ultimately pled guilty in his own case and received a two-year suspended sentence.

On cross-examination, Petitioner agreed that he had several drug convictions and a conviction for unlawful possession of a firearm on his record. All of the drug convictions involved possession of cocaine with intent to sell or the sale of cocaine.

Petitioner testified that his discussions with trial counsel went in circles, and trial counsel told him that he might be able to get him a better deal if given more time. He also claimed that trial counsel told him that he did not feel as though he could ever win Petitioner's case. Petitioner testified that the State's plea offer was for the minimum sentence of "[e]ight years at 100 percent." He said that trial counsel did not explain the elements of the crime that he was charged with but he explained the sentencing range for the crimes. Petitioner thought that he faced a potential sentence of thirty-six years if convicted.

Petitioner testified that in the case of *State v. Travis Lindsey*, Officer Gray testified that Mr. Odie's bond reduction was "part of a deal." He said:

> Then Kevin O[die] further testified and agreed with Officer Gray saying that this was part of a deal. So I automatically assumed that my lawyer should have knew [sic] about this deal and should have br[ought] this deal to me. That could have also made me, I don't want to go to trial, I'm going to go ahead and take this deal. But I wouldn't have d[one] none of that with my lawyer telling me you're going to give me a better deal.

Petitioner testified that during Petitioner's trial, trial counsel asked Mr. Odie if any deals or promises had been made to him, and Mr. Odie said no.

Trial counsel testified that he met with Petitioner after being appointed to represent him. He went over each element of the offense with Petitioner and told him that the State would be required to prove each element beyond a reasonable doubt. Trial counsel testified that given the evidence in discovery, Petitioner had a very good chance of being found guilty at trial. Trial counsel did not have a plea offer from the State at the time. Trial counsel testified that the State eventually made a plea offer, and trial counsel timely communicated the offer to Petitioner. He agreed that there were scheduling orders used in Petitioner's case, and there was a plea or settlement deadline in the case. Trial counsel testified that he communicated any plea offers to Petitioner prior to the plea or settlement deadline. He further testified that he spoke with Petitioner about the settlement deadline. Trial counsel asserted: "And that's really one of the main points that I spoke to [Petitioner] about." He never advised Petitioner not to worry about the original plea offer because he was going to obtain a better offer. However, trial counsel testified:

> I did talk to him about the possible better offer. I told [Petitioner] the offer, which was eight years at 100 percent. And it was a 100

percent sentence because it was within a thousand feet of Fairfield (sic) Park. And like I said a while ago, I went over each element of that offense with him. I told him that, look, we have got a plea deadline date. That is what is on the table. You don't mess with Judge Hargrove when it comes to plea deadlines. You will go to trial if you don't get it done.

He was -- and I was very sympathetic to him. He was very concerned about his little girl, I believe, that he had just had. And he -- he was very immersed in that really more so than his case. And I have never been in his position. I can certainly understand that. But he was, no, I just can't leave my little girl. And I told him, I said, look, the minimum time that you can get if you go to trial is eight years at 100 percent. That is if Judge Hargrove decides, if you are convicted of all three, that is if Judge Hargrove decides to run each of the offenses together, run them concurrently, and sentence you to the lowest number of years within the range, which is eight years. I said the worse [sic] case scenario would be for you to be sentenced to 12 years on each offense.

* * *

And Judge Hargrove ran them consecutively. And I said, given your prior background, given your criminal history, and given Judge Hargrove's reputation as a tough judge, fair but tough, she might do that. And I urged [Petitioner] to think about his daughter in the manner of, you know, if you want to see your daughter, you know, you might want to take this plea. You have an opportunity to knock of[f] 15 percent and get it down to 85 percent for which he would have to serve. I said if you go to trial and you are convicted and the worst happens, you won't ever see your daughter grow up.

Trial counsel testified that he did not place Petitioner's rejection of the plea offer in writing. He asserted that he last discussed the plea offer with Petitioner and reminded him of the plea deadline during a visit with Petitioner at the Turney Center prison. Trial counsel testified:

I said, what I had told him at first, as I testified earlier, was that, okay, this is your plea deadline. This is your plea offer; however, you need to look at this as concrete. This, you have to do this if you want to guarantee and lock in this plea offer, if Judge Hargrove would have accepted it. I believe Her Honor would have. But I can try to get them to take the within 1,000 feet of a park, or whatever, off because anywhere you go in this town you are within 1,000 feet of a park or a school or a church or somewhere. And

9

there is nowhere you could sell drugs in this town and not be within a thousand feet of something like that, just about.

On cross-examination, trial counsel agreed that he filed a motion to withdraw as Petitioner's counsel. A portion of the motion contained the following language:

> Undersigned counsel received an offer from Assistant District Attorney Brent Cooper and undersigned counsel conveyed that offer to the defendant and told the defendant that this Court required defendants to accept and enter into plea agreements roughly one month prior to the scheduled trial date. Undersigned counsel further explained to the defendant that if a criminal defendant did not so timely enter into a plea agreement, that this Court would only allow such a defendant to either, one, plead guilty to all charges in the indictment and have a subsequent sentencing hearing, in other words a blind plea, or have a jury trial.

Trial counsel testified that he explained the scheduling order, which contained the plea deadline date, to Petitioner.

*Pillow v. State*, No. M2018-01275-CCA-R3-PC, 2020 WL 7040532, at *3-6 (Tenn. Crim. App. Dec. 1, 2020).

III.  STANDARD OF REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant

10

a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations may be found unreasonable only "if it is shown that the state court's

11

presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Subject to Habeas Rule 7, review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and

factual substance of every claim to all levels of state court review"). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the TCCA. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). Claims that are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002).

A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). Second, if a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is technically exhausted (given that there is nothing additional the petitioner could do to obtain relief in state court), but a petitioner is not automatically entitled to present his claim on federal habeas review, as his claim is procedurally defaulted. *Woodford v. Ngo*, 548 U.S. 81, 126 (2006).

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Id.* at 386. The burden of showing cause and actual prejudice to excuse defaulted claims is on the habeas petitioner. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.*

Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488-89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can be used as cause for the underlying defaulted claim only if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance of trial counsel by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say

14

that the prisoner must demonstrate that the claim has some merit." *See id*. at 13-15. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his <u>actual</u> and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496). A petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *McQuiggin v. Perkins*, 569 U.S. 383, 399 (2013) (internal quotation marks omitted) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). For a petitioner to "pass through the gateway" and be permitted to argue the merits of his defaulted claims, he must show "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error." *Id.* at 401 (internal quotation marks omitted) (quoting *Schlup*, 513 U.S. at 316).

With these principles in mind, the Court will turn to the examination of the claims raised in Pillow's petition for habeas relief.

IV. <u>ANALYSIS</u>

Petitioner is not entitled to relief under Section 2254 because his claims are without merit or or are procedurally defaulted without sufficient cause. The Court will address each category of claims in turn.[2]

A. <u>Exhausted Claims</u>

The Court begins with Petitioner's exhausted claims. They are 1) Ground One (ineffective assistance of counsel based on trial counsel's failure to communicate the deadline on the State's plea offer) and 2) Ground Three (*Brady* and *Napue* claims). The TCCA's resolution of these claims was not unreasonable.

Within this section the Court also will address Ground Five, a claim of structural error that relies on a Supreme Court decision that had not yet been issued at the time of Petitioner's post-conviction proceedings. That claim does not provide relief to Petitioner either.

1. *Ineffective Assistance of Counsel (Ground One)*

Petitioner's first ground for relief alleges that trial counsel was deficient in two ways, but only one of those subclaims is exhausted. The exhausted subclaim is that trial counsel provided ineffective assistance by "failing to clearly communicate the [] deadline on state's plea offer" and "by allowing the deadline for the offer to lapse, trial counsel forced appellant to go to trial, prejudicing petitioner with an extension of four (4) additional years beyond the original plea offer added to his sentence" (Doc. No. 1 at PageID# 14).

In his post-conviction proceedings, Petitioner argued that "trial counsel rendered deficient performance by failing to inform him of the deadline set by the trial court for accepting the State's plea offer." *Pillow*, 2020 WL 7040532, at *7. The post-conviction court denied relief,

---

[2] The Court need not address Petitioner's tolling argument. Respondent concedes that the petition was timely filed. (Doc. No. 13 at PageID# 999-1001).

crediting trial counsel's testimony and finding that "[t]he Court has no doubt that [trial counsel] explained to [Petitioner] the deadline for accepting a plea agreement and entering a plea." *Id*. at *8.

On appeal of the denial of post-conviction relief, the TCCA addressed the claim on the merits and found that Petitioner was not entitled to relief. *Id*. Specifically, the TCCA found that the record did "not preponderate against the post-conviction court's factual findings," noting trial counsel's testimony at the post-conviction hearing and the language of trial counsel's motion to withdraw. *Id*. The TCCA pointed out that the post-conviction court had found that trial counsel's testimony was more credible than Petitioner's testimony and the TCCA does not re-weight or re-evaluate the credibility determinations made by the post-conviction court. *Id*.

Here, the record reflects that it was not unreasonable for the TCCA to conclude that the evidence did not preponderate against the post-conviction court's findings. During Petitioner's post-conviction hearing, trial counsel testified that he timely communicated the plea offer to Petitioner. (Doc. No. 12-16 at PageID# 869). Trial counsel further testified that the parties operated under the trial court's scheduling order, which established a "plea settlement deadline", described by counsel as "the important one in this case" because "[i]t was very rare for Judge Hargrove . . . to accept a plea after the plea deadline date." (*Id*. at PageID# 870-71). Trial counsel reiterated that the settlement deadline was "really one of the main points that [he] spoke to [Petitioner] about." (*Id*. at PageID# 871). Trial counsel emphatically stated that he did not ever tell Petitioner "[Y]ou know, don't worry about this offer, I'm going to get you a better offer." (*Id*.)

Petitioner, who bears the burden here, fails to explain why the TCCA's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or that

17

the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner does not provide any evidence to contradict the state courts' findings, which are supported by the record. Instead, he simply argues that the state courts "failed to give any weight or consideration to available evidence which supported [his] position." (Doc. No. 1 at PageID# 18). The state court's determinations are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1), which Petitioner has not submitted.

Consequently, the Court finds that Petitioner has not shown that he is entitled to relief on this claim because the TCCA's determination was not contrary to law. Neither was the TCCA's determination based on an unreasonable applicable of the law to the facts. This subclaim is without merit and will be dismissed.

### 2. *Brady and Napue Claims (Ground Three)*

In Ground Three of the petition, Petitioner raises claims pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959).

These claims are based on Petitioner's contention that the State's informant and key witness, Kevin Odie, committed perjury at Petitioner's trial by testifying that he had not been promised anything by the State in exchange for his cooperation. (Doc. No. 1 at Page ID# 22-26). Petitioner developed this argument after he read the decision in *State v. Lindsey*, No. M2015-01954-CCA-R3-CD, 2016 WL 59378325 (Tenn. Crim. App. Oct. 12, 2016), and learned that Odie's bond for his own charges had been reduced from $100,000 to $2,500 so that he could work for the police as an informant. According to Petitioner, the State allowed perjured testimony at Petitioner's trial and violated *Brady* by not informing trial counsel of the bond arrangement with Odie. Petitioner also contends that the State unconstitutionally permitted Odie

18

to falsely testify that he received nothing in exchange for his work as a confidential informant under *Napue*. (Doc. No. 1 at PageID# 22-26).

The TCCA addressed this claim on its merits during its review of Petitioner's post-conviction appeal. The TCCA began[3] by correctly setting forth the relevant law governing a *Brady* claim. *Pillow*, 2020 WL 7040532, at at *9. The court then cited relevant Tennessee case law concerning false testimony. *Id*. Ultimately, the TCCA determined that Petitioner was not entitled to relief on this claim under *Brady* or *Napue*, explaining:

> As pointed out by the State, trial counsel was not questioned about this issue at the post-conviction hearing to determine what he knew or did not know about Mr. Odie's bond reduction. Also, the trial prosecutor was not called as a witness. The only proof presented was Petitioner's testimony that he read the *Travis Lindsey* case and learned of the bond reduction. He further asserted that the State should have corrected Mr. Odie's perjured testimony at his trial and that the State knew that "deals" had been made with Mr. Odie, and Petitioner's trial counsel should have known of the deals. Petitioner believed that Mr. Odie's dishonesty on the witness stand about the bond reduction was one of Petitioner's "greatest arguments" on post-conviction and would have affected the outcome of his case. However, Petitioner failed to show that the State suppressed the information or knowingly used false information. As argued by the State in its brief, trial counsel could have possessed the information about Mr. Odie's bond arrangement but chose not to use it. Additionally, it is not clear from the record that Mr. Odie actually committed perjury. Mr. Odie was asked at Petitioner's trial only if he was "promised anything" in exchange for working with the State. *Brian Pillow*, 2016 WL 1270263, at *2-3. It appears that the purpose of this line of questioning was to determine whether Mr. Odie was promised a favorable settlement of his own pending criminal charges. He admitted at Petitioner's trial that he was seeking favor with the State but had no deal in place. This testimony was not false. Petitioner also has not demonstrated that Mr. Odie's bond reduction was material to Petitioner's case since the jury was already aware that Mr. Odie had motivation to lie in order to help his own case. Furthermore, as pointed out by the State, the revelation of Mr. Odie's bond reduction in the *Lindsey* case did not help the defendant in that case who was convicted of similar drug offenses as Petitioner. *Travis Lindsey*, 2016 WL 5937835, at *1.

---

[3] The court noted that the State argued that the issue was waived because Petitioner had withdrawn this claim in his amended post-conviction petition filed by post-conviction counsel. But the TCCA concluded that, "[a]lthough Petitioner abandoned the claim concerning Mr. Odie's alleged perjured testimony in his amended post-conviction petition, and the post-conviction court did not make specific findings concerning this ground for relief, evidence, though scant, was presented at the post-conviction hearing on this ground." *Pillow*, 2020 WL 7040532, at *10. Having so concluded, the court reviewed the claim on its merits.

19

*Pillow*, 2020 WL 7040532, at *10.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted). As the Supreme Court explained:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). "[T]he materiality of withheld evidence may be determined only by evaluating the evidence collectively." *Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003). "Evidence that is 'merely cumulative' to evidence presented at trial is 'not material for purposes of *Brady* analysis.'" *Brooks v. Tenn.*, 626 F.3d 878, 893 (6th Cir. 2010) (quoting *Carter v. Mitchell*, 443 F.3d 517, 533 n.7 (6th Cir. 2006)). Materiality for *Brady* purposes is a "difficult test to meet," and must be determined in light of the totality of the evidence, including the weight of the evidence of the petitioner's guilt. *See Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011). Thus, to prevail on a *Brady* claim, the petitioner must prove that the evidence at issue was favorable to the defense, that the State willfully or inadvertently suppressed the evidence, and

20

that, as a result, the petitioner was prejudiced. *Brooks*, 626 F.3d 878, 890 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Here, with respect to Petitioner's *Brady* claim, the TCCA reasonably found that the Petitioner had not established that the State suppressed the evidence at issue. There is no proof establishing that the State withheld information or knowingly used false information about Odie's bond arrangement. Petitioner did not prove that trial counsel was aware of Odie's bond reduction. Indeed, Petitioner failed to question trial counsel about his knowledge of the reduction. The trial prosecutor was not called as a witness. And as the TCCA noted, the record does not conclusively establish that Odie committed perjury. Odie admitted he wanted consideration from the State on his own charges when trial counsel questioned him to see if he "was promised a favorable settlement[.]" *Pillow*, 2020 WL 7040532, at *10.

The TCCA also reasonably found that Odie's bond reduction was immaterial to Petitioner's case. The court made this finding based on two reasons: (1) "the jury was already aware that Mr. Odie had motivation to lie in order to help his own case[,]" and (2) the information did not help the *Lindsey* defendant who was convicted of similar drug offenses as Lindsey. *Pillow*, 2020 WL 7040532, at *10. Accordingly, the state court's rejection of Petitioner's *Brady* claim was not contrary to, or unreasonable application of, federal law. The claim, therefore, will be dismissed.

Turning to Petitioner's *Napue* claim, which he also raises in Ground Three, "a conviction obtained through the use of false evidence, known to be such by representatives of the State" deprives a defendant of due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Giglio v. United States*, 405 U.S. 150, 153 (1972); *State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). "The same result obtains when the State, although not soliciting false evidence,

21

allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269. Therefore, when a witness testifies falsely, either on direct or cross-examination, the state has an affirmative duty to correct such false testimony. *Spurlock*, 874 S.W.2d at 617.

The TCCA's *Napue* application was reasonable. As discussed above, it was not unreasonable to conclude that Odie's testimony was immaterial because the jury knew Odie's criminal history and his incentive to lie "to help his own case." *Pillow*, 2020 WL 7040532, at *10. It also was not unreasonable for the TCCA to conclude that "it is not clear from the record" that Odie's testimony was false because he admitted he wanted consideration from the State on his own charges when trial counsel questioned him to see if he "was promised a favorable settlement[.]" *Id*. Petitioner has not "rebutted by clear and convincing evidence" the TCCA's factual determinations, which have support in the record. *Pouncy*, 846 F.3d at 158.

Consequently, the Court finds that Petitioner has not shown that he is entitled to relief on this claim because the TCCA's determination was not contrary to law. Neither was the TCCA's determination based on an unreasonable application of the facts. Ground Three is without merit and will be dismissed.

### 3. *McCoy Claim (Ground Five)*

In his Petitioner's fifth claim, he alleges that trial counsel conceded Petitioner's guilt in violation of his right to autonomy as outlined in *McCoy v. Louisiana*, 584 U.S. 414 (2018). (*See* Doc. No. 1 at PageID# 28-20). In *McCoy*, the Supreme Court held:

> a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty.... [I]t is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt.

*Id.* at 1505. The Sixth Circuit Court of Appeals, in an unpublished decision, has concluded that *McCoy* does not apply retroactively on collateral review. *See Pennebaker v. Rewerts*, No. 21-1216, 2021 WL 7237920, at *3 (6th Cir. Sept. 10, 2021) ("*McCoy* is not a new rule of constitutional law that applies retroactively."). Other Circuits have similarly held. *See Kellogg-Roe v. Gerry*, 19 F.4th 21, 26 (1st Cir. 2021) ("*McCoy* added a new item to [the] list" of "[f]undamental decisions reserved to the client[.]"); *Smith v. Stein*, 982 F.3d 229, 233-34 (4th Cir. 2020) (holding that *McCoy* did not apply retroactively on collateral review or provide a basis for extending the § 2254 statute of limitations, because it was not a substantive rule and, even if it was a new procedural rule, it did not constitute a "watershed" rule); *Christian v. Thomas*, 982 F.3d 1215, 1222, 1225 (9th Cir. 2020) ("assum[ing] without deciding that *McCoy* did indeed create a new rule of constitutional law and that it was previously unavailable to [the petitioner]" but holding that "the Supreme Court has not made *McCoy v. Louisiana* retroactive to cases on collateral review"). Thus, because *McCoy* does not apply retroactively to cases on collateral review, Petitioner cannot rely on *McCoy* for relief in this collateral attack. *See e.g., French v. Burt,* No. 1:17-cv-837, 2021 WL 5018808, at *13 n.6 (W.D. Mich. Apr. 5, 2021) (where petitioner argued that trial counsel usurped petitioner's decision when counsel conceded guilt at trial, finding petitioner's reliance on *McCoy* "misplaced" because the case "announced a new rule of criminal procedure which is not retroactive" in petitioner's collateral proceeding)*; United States v. Allen*, No. 5:19-cv-60, 2020 WL 3865094, at *5-6 (E.D. Ky. Feb. 28, 2020) (collecting cases for the proposition that *McCoy* "announced a new rule of criminal procedure" since its holding "was not dictated by precedent."); *Cody v. Sheldon*, No. 1:18-cv-1787, 2020 WL 9460507, at *33 (N.D. Ohio Mar. 24, 2020), *report and recommendation adopted* 2021 WL 1437557 (N.D. Ohio Apr. 16, 2021), *appeal filed sub nom. Cody v. McConahay*, No. 21-3462

23

(6th Cir. May 18, 2021); *Elmore v. Shoop*, No. 1:07-cv-776, 2019 WL 5287912, at *6-7 (S.D. Ohio Oct. 18, 2019), *report and recommendation adopted* 2020 WL 3410764, at *13 (S.D. Ohio June 22, 2020).

Even if error based on *McCoy* were available to Petitioner, it does not appear that defense counsel's decision to stipulate that "Fairview Park was a drug free zone pursuant to Tennessee Code Annotated section 39-17-432(b)(1)" would have implicated *McCoy*, as there is no suggestion that counsel conceded the defendant's *guilt*. Instead, counsel conceded an element of the offense. *See Peoples v. Fitz*, No. 3:15-cv-666, 2024 WL 3970681, at *20 (M.D. Tenn. Aug. 28, 2024) (Trauger, J.) (where petitioner "only argued that counsel conceded 'an element of the offense' . . . counsel did not concede his client's guilt"). Thus, even if *McCoy* applied retroactively, Petitioner has not established a structural violation of the Sixth Amendment and is not entitled to relief on the merits of his claim.

### B. Procedurally Defaulted Claims

Petitioner procedurally defaulted three claims, two of which are ineffective assistance of counsel claims: Ground One (counsel's failure to secure the sequestration of witnesses during Petitioner's post-conviction hearing); Ground Two (Petitioner's relationship with counsel had deteriorated to such an extent that, by the time of trial, there was a conflict of interest in counsel's representation); and Ground Four (counsel's failure to investigate and to call Petitioner's uncle to testify at trial). Petitioner has not demonstrated cause and prejudice to excuse the defaults. Neither does Petitioner assert that a fundamental miscarriage of justice will occur if the Court does not excuse these defaults and review these claims on the merits. These claims are therefore barred from review in this court.

Arguably, in Ground Five Petitioner raises an additional ineffective assistance of counsel claim based on trial counsel's stipulation that the Fairview Park was a drug-free zone. The Court also addresses that claim in this section. That claim, like the others, does not provide relief.

### 1. Ineffective Assistance of Counsel (Ground One)

Petitioner next alleges that counsel was ineffective because he failed to secure the sequestration of witnesses during Petitioner's post-conviction hearing. (*See* Doc. No. 1 at PageID# 16). According to Petitioner, counsel's "failure to invoke the rule of sequestration caused the hearing to not be fair and resulted in prejudice because it allowed trial counsel Johnson to tailor his testimony to match that needed by the state." (*Id.*)

Petitioner did not raise this claim during his post-conviction proceedings. Consequently, he has waived the claim for purposes of federal habeas corpus review. 28 U.S.C. § 2254(c); *Coleman*, 501 U.S. at 732. As noted above, the Court can only review a defaulted claim if Petitioner establishes cause for the default and actual prejudice or that the Court's failure to address these claims would result in a fundamental miscarriage of justice.

Petitioner does not acknowledge his default of these claims. He does not attempt to establish cause or prejudice to excuse the defaults. Neither does he argue that a fundamental miscarriage of justice would occur if the Court does not excuse the defaults and address the claims on the merits. This claim therefore barred from review in this court.

To the extent Petitioner raises this claim outside of the ineffective assistance of counsel context and argues that the trial court should have sequestered the post-conviction witnesses, the Sixth Circuit has consistently held that alleged errors in post-conviction proceedings "do not directly challenge the judgment pursuant to which a petitioner is in custody[.]" *Rockwell v. Palmer*, 559 F. Supp. 2d 817, 831 (W.D. Mich. 2008) (citing *Roe v. Baker,* 316 F.3d 557, 571

25

(6th Cir. 2002), and *Alley v. Bell*, 307 F.3d 380, 387 (6th Cir. 2002)). That is because a claim "related to collateral post-conviction proceedings, even if resolved in the petitioner's favor, would not 'result [in] . . . release or reduction in . . . time served or in any other way affect his detention because [the court] would not be reviewing any matter directly pertaining to his detention.'" *Id*. (quoting *Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986)).

### 2. *Conflict of Interest in Counsel's Representation (Ground Two)*

In Ground Two, Petitioner alleges that his representation with trial counsel had deteriorated to such an extent that, by the time of trial, there was a conflict of interest in counsel's representation. (Doc. No. 1 at PageID# 19-21).

In his post-conviction proceedings, Petitioner alleged that "he expressed 'absolute frustration' and 'dissatisfaction' on the morning of his trial with trial counsel and requested new counsel." *Pillow*, 2020 WL 7040532, at *8. The court denied Petitioner's request but appointed co-counsel to sit with trial counsel throughout the trial. Petitioner's post-conviction petition was denied and, on the appeal of denial of post-conviction relief, Petitioner argued that "if the court believed the remedy to a conflict between appointed counsel and his client was to appoint co-counsel, the court should have ordered a continuance to allow co-counsel time to prepare." *Id*.

The TCCA found that, although Petitioner raised the issue of co-counsel being appointed in his original petition, he abandoned this issue in his amended petition. *Pillow*, 2020 WL 7040532, at *8. The TCCA further found that there was no evidence presented at the post-conviction hearing in support of this claim other than trial counsel's testimony that he did not recall co-counsel being in any way involved at Petitioner's trial. *Id*. There was no testimony about a continuance presented at the post-conviction hearing. The TCCA noted that co-counsel

26

did not testify at the post-conviction hearing, and the post-conviction court made no findings on this issue. *Id*. The court ultimately found this claim was waived. *Id*.

Additionally, the TCCA found that this claim is not cognizable in a post-conviction proceeding and should have been raised on direct appeal. "A post-conviction petition is not a vehicle to review errors of law as a substitute for direct appeal." *French v. State*, 824 S.W.2d 161, 163 (Tenn. 1992); *see* Tenn. Code Ann. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented ...").

"[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 582 U.S. 521, 527 (2017) (citing *Beard v. Kindler*, 558 U.S. 53, 55 (2009)). When determining whether a claim has been procedurally defaulted based on an adequate and independent state procedural rule, the court applies the following test:

> (1) the court must determine that there is a state procedural rule with which the petitioner failed to comply; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) the state procedural rule must have been an adequate and independent state procedural ground upon which the state could rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error.

*Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002).

Here, Tenn. Sup. Ct. R. 28 § 8(D)(4) constitutes an adequate and independent state-law ground for procedural default. *See McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (Tennessee's waiver rule is "an 'adequate

27

and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim.")). The TCCA's decision clearly shows that Petitioner did not comply with this state procedural rule by failing to incorporate this claim into his amended petition, thus barring it from presentation at the evidentiary hearing. (*See* Doc. No. 12-14 at Page ID# 758-59, 790) (noting that post-conviction counsel declined to raise the claim). The TCCA enforced this state procedural rule against Petitioner considering its citation and application in its opinion.

The same is true concerning the TCCA's citation and application of Tenn. Code Ann. § 40-30-106(g). The rule states that claims are waived if they are not presented to the first court of competent jurisdiction, which occurred here since Petitioner could have raised this claim on direct appeal but did not. (*See generally* Doc. No. 12-8 at Page ID# 633-65). The TCCA enforced this rule against Petitioner as shown in its opinion. *See Pillow*, 2020 WL 7040532, at *9. Thus, the first two *Monzo* prongs are satisfied in this case.

Turning to the third *Monzo* prong, these two state procedural rules (Tenn. Sup. Ct. R. 28 § 8(D)(4) and Tenn. Code Ann. § 40-30-106(g)) constitute adequate and independent state-law grounds for default purposes. A state procedural rule is "adequate" if the rule was "firmly established and regularly followed by the time as of which it [was] to be applied." *Fautenberry v. Mitchell*, 515 F.3d 614, 640-41 (6th Cir. 2008) (emphasis omitted). Thus, this Court must determine "whether, at the time of the petitioner's actions giving rise to the default, the petitioner … [was] deemed to have been apprised of the rule's existence." *Id*. at 641.

Tenn. Sup. Ct. R. 28 § 8(D)(4) satisfies this test. Petitioner pursued post-conviction relief from 2017 until 2021. (Doc. No. 12-14 at Page ID# 766; Doc. No. 12-23 at Page ID# 990). The TCCA enforced this procedural rule against other petitioners before and during Petitioner's post-conviction proceedings. *See e.g., Stewart v. State*, No. E2019-00859-CCA-R3-ECN, 2020 WL

28

7240300, at *9 (Tenn. Crim. App. Dec. 9, 2020) (citing the rule for the point that the evidentiary hearing "shall be limited to issues raised in the petition"); *Woods v. State*, No. W2016-00188-CCA-R3-PC, 2016 WL 6596101, at *5 (Tenn. Crim. App. Nov. 7, 2016) (finding that "these arguments were not presented to the post-conviction court, have no factual basis in the record before us, and are therefore waived on appellate review."). Further, a sister court previously found that this rule is an adequate and independent state-law rule. *See Grasty v. Parris*, No. 1:17-cv-247, 2019 WL 4545600, at *6 (E.D. Tenn. Sept. 19, 2019). The same is true for Tenn. Code Ann. § 40-30-106(g). *See Hollis v. Perry*, No. 3:17-cv-626, 2018 WL 6181354, at *30 (M.D. Tenn. Nov. 27, 2018) (citing *Coe v. Bell*, 161 F.3d 320, 331 (6th Cir. 1998)), *certificate of appealability denied*, No. 19-5051, 2019 WL 3206686 (6th Cir. Apr. 24, 2019) (finding that this rule constituted an adequate and independent state rule for procedural default). *Monzo*'s third prong is satisfied.

Finally, Petitioner does not offer cause or prejudice to excuse his default. Construing the pro se petition liberally, the Court could infer that Petitioner asserts his complaints against post-conviction counsel as cause. (See Doc. No. 1 at PageID# 20, 31-34). Even then, the argument fails. "Cause" to excuse a procedural default turns on "whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753. Alleged ineffectiveness of post-conviction counsel does not constitute cause to excuse a default because Petitioner has no right to post-conviction counsel, absent *Martinez* and *Trevino*'s equitable exceptions. *Id.* at 752-53. However, "*Martinez* and *Trevino*'s equitable exception allowing the ineffective assistance of post-conviction counsel to constitute cause for procedural default applies only to claims of ineffective assistance of trial counsel; it does not apply to any other claims, including ineffective assistance of appellate

counsel." *Hale v. Shoop*, No. 1:18-cv-504, 2021 WL 1215793, at *98 (N.D. Ohio Mar. 31, 2021) (citing *Martinez*, 566 U.S. at 9; *Trevino*, 569 U.S. at 422). Thus, *Martinez* affords no relief here.

In summary, Petitioner does not acknowledge his default of this claim. He does not attempt to establish cause or prejudice to excuse the defaults. Neither does he argue that a fundamental miscarriage of justice would occur if the Court does not excuse the defaults and address the claim on the merits. This claim is therefore barred from review in this court.

### 3. *Ineffective Assistance of Counsel (Ground Four)*

In Ground Four, Petitioner alleges that trial counsel should have investigated and called Petitioner's uncle to testify at trial. (Doc. No. 1 at PageID# 26-28). According to Petitioner, his uncle would have taken responsibility for selling the drugs to Odie, providing Petitioner a "third-party defense" to the charges. (*See id*.).

Petitioner did not raise this claim to the TCCA on post-conviction appeal. (*See generally* Doc. No. 12-17 at PageID# 909-28; *Pillow*, 2020 WL 7040532, at *1-10). Because Petitioner did not present this claim to the TCCA on post-conviction appeal, the first court of competent jurisdiction, he procedurally defaulted this claim. 28 U.S.C. § 2254(c); *Coleman*, 501 U.S. at 732. He therefore has waived that claim for purposes of federal habeas corpus review. The Court can only review this defaulted claim if Petitioner establishes cause for the default and actual prejudice or that the Court's failure to address these claims would result in a fundamental miscarriage of justice.

Petitioner acknowledges the claim's default and invokes the equitable exception provided by *Martinez*. (*See* Doc. No. 1 at PageID# 28, 31-34, 37-38). *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a

30

substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Here, *Martinez* provides no relief for two reasons.

First, Petitioner litigated this claim during his post-conviction evidentiary hearing, which was the initial collateral review proceeding in this matter. (*See* Doc. No. 12-14 at Page ID# 798-99; Doc. No. 12-16 at Page ID# 837, 853-54, 878-79, 891). The default occurred on post-conviction appeal when Petitioner did not litigate the claim before the TCCA. (*See generally* Doc. No. 12-17 at Page ID# 909-28); *Pillow*, 2020 WL 7040532, at *1-10. "'[A]ttorney error at state postconviction appellate proceedings cannot excuse procedural default under the *Martinez-Trevino* framework.'" *Middlebrooks*, 843 F.3d at 1136 (quoting *West v. Carpenter*, 790 F.3d 693, 699 (6th Cir. 2015). Thus, Petitioner cannot show that the alleged effective assistance of post-conviction counsel occurred during the "initial-review collateral proceeding" as *Martinez* requires.

Second, the defaulted claim is not substantial. In demonstrating a substantial claim of ineffective assistance of trial counsel, the petitioner must prove prejudice under *Strickland*. *See McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 752 (6th Cir. 2013) ("To be successful under *Trevino*, [a petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim." (internal citations omitted)). Under *Strickland*, a petitioner can prove prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. 668, 694. As one court explains, describing the interplay between *Coleman* (relating to the prejudice requirement for excusing procedural default of a claim, whether under *Martinez* or otherwise) and *Strickland* (relating to the prejudice requirement for an underlying ineffective assistance of counsel claim):

The "actual prejudice" requirement of *Coleman* and the prejudice requirement of *Strickland* overlap such that in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

*Thorne v. Holloway*, No. 3:14-cv-0695, 2014 WL 4411680, at *23 (M.D Tenn. Sept. 8, 2014). The Supreme Court has defined this required "substantial" showing as a showing that the claim has some merit. *Martinez*, 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322, (2003)). The threshold inquiry "does not require full consideration of the factual or legal basis supporting the claims." *Miller-El*, 537 U.S. at 336, 338.

*Martinez*, however, provides no relief here because the defaulted claim does not have merit. 566 U.S. at 14. Trial counsel testified that he decided against calling Petitioner's uncle to testify under "the theory of criminal defense called plan B" because there was "a danger" that, in doing so, the prosecution could have requested that it be allowed to introduce evidence of Petitioner's prior convictions. (Doc. No. 12-16 at Page ID# 878-79, 891). This testimony established that trial counsel strategically decided against putting forth this defense theory, and this reasonable trial strategy is now "virtually unchallengeable." *See Strickland*, 466 U.S. at 688-90. Petitioner cannot satisfy the performance prong; thus, the claim fails.

Even assuming *arguendo* that trial counsel performed deficiently, Petitioner has not established that he was prejudiced by the purported failure of trial counsel to call Petitioner's uncle to testify. *See Coleman*, 501 U.S. at 750. As noted by the TCCA on direct appeal, the evidence supported the jury's finding "beyond a reasonable doubt that the Appellant sold .5 grams or more of cocaine in a drug-free zone on three occasions." *Pillow*, 2016 WL 1270263, at

32

*8. Had trial counsel called the uncle to testify and, as trial counsel feared, the prosecution used the uncle's testimony as a way to convince the trial court to admit evidence of Petitioner's prior convictions, there would have been even more evidence against Petitioner.

This meritless claim is not substantial, and Petitioner has not shown that he was prejudiced by post-conviction counsel's failure to raise it. Therefore, Petitioner cannot demonstrate cause and prejudice to excuse his procedural default of this claim. The claim is without merit and will be dismissed.

### 4. *Ineffective Assistance of Counsel (Ground Five)*

To the extent Petitioner contends that trial counsel provided ineffective assistance of counsel by stipulating that the Fairview Park was a drug-free zone, the claim is procedurally defaulted. While Petitioner raised this factual predicate as a *Strickland* claim in his post-conviction proceedings (and the post-conviction court denied relief after finding that trial counsel strategically decided to stipulate to this matter) (Doc. No. 12-14 at Page ID# 755, 797; Doc. No. 12-16 at Page ID# 875), the claim was defaulted on post-conviction appeal when Petitioner failed to raise the issue in his brief. (*See generally* Doc. No. 12-17 at Page ID# 909-28). Further litigation of this claim in state court is now barred by the waiver rule. *See* Tenn. Code Ann. § 40-30-106(g).

Petitioner cannot use *Martinez* to escape this default because he litigated the claim in the initial collateral-review proceeding before defaulting it on collateral appeal. Thus, *Middlebrooks* bars further review of this claim under *Martinez*. 843 F.3d at 1136.

Even if the claim could be addressed on the merits, Petitioner has not shown that trial counsel's stipulation constituted constitutionally deficient performance. The record shows that trial counsel investigated the requisite distance of the park from the crime scene and discovered

33

the drug sales occurred "within 1,000 feet because of that, because of that website put out by the government of the state." (Doc. No. 12-16 at PageID# 876). Trial counsel testified during Petitioner's post-conviction hearing that counsel therefore hoped to "gloss [the element] over" through stipulation because challenging the element would be futile and "would have just piled his guilt on, made him look worse." (*Id*.) Counsel also testified that, as a matter of strategy, he was of the opinion that "just being the one to read the stipulation in the courtroom sort of makes it sound like you won the argument." (*Id*. at PageID# 874). Counsel's strategic decisions pertaining to the drug-free zone stipulation were based on his reasonable investigation and cannot now be second-guessed. Thus, Petitioner cannot satisfy *Strickland*'s performance prong. This claim fails.

    C. <u>Summary</u>

    In summary, Petitioner's exhausted claims lack merit. Those claims are Ground One (ineffective assistance of counsel based on trial counsel's failure to communicate the deadline on the State's plea offer); Ground Three (*Brady* and *Napue* claims); and Ground Five (*McCoy* claim).

    Petitioner's other claims are procedurally defaulted without sufficient cause, and Petitioner has not shown that failure to consider those claims on the merits will result in a fundamental miscarriage of justice. Those claims are Ground One (ineffective assistance of counsel based on counsel's failure to secure the sequestration of witnesses during Petitioner's post-conviction hearing); Ground Two (Petitioner's relationship with counsel had deteriorated to such an extent that, by the time of trial, there was a conflict of interest in counsel's representation); Ground Four (ineffective assistance of counsel based on counsel's failure to call

Petitioner's uncle to testify at trial); and Ground Five (ineffective assistance of counsel claim based on trial counsel's stipulation that the Fairview Park was a drug-free zone).

## V. CONCLUSION

For the reasons set forth herein, the petition seeking relief under 28 U.S.C. § 2254 is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

In so ruling, the Court notes that it does not write on a clear slate in adjudicating the petition. The Court does not resolve the petition by deciding, for example, whether Petitioner was in fact guilty (and if so, of what), whether Petitioner should have been convicted by the jury (and if so, of what), or even whether it personally believes in the first instance that Petitioner's claims are meritorious. Instead, as discussed herein in detail, the Court applies established principles to determine the extent to which it can review Petitioner's claims at all, and, for those claims that it determines it can review, it applies the demanding standards of AEDPA.

## VII. CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claims, the Court **DENIES** a COA. However, Petitioner may seek a COA from the Sixth Circuit.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE